# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF FILED
## COLOMBIA

APR 2 0 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Telly Guillory #32044

_____

_____

PLaintiFF

Docket No: _____
Magistrates _____
Judge : _____
Division: _____

Versus

George W. Bush, Jr.
Kathleen Blanco
Louisiana Pardon Board
20th Judicial District Court
First Circuit Court of Appeal
Louisiana Supreme Court
U.S. Middle District Court
U.S. Fifth Circuit Court
U.S. Supreme Court

DeFendant(s)

Case: 1:07-cv-00780
Assigned To : Kennedy, Henry H.
Assign. Date : 4/20/2007
Description: PRO SE GEN. CIVIL

## COMPLAINT

1. Previous Lawsuits:

   a. Have you begun other Lawsuits in state or Federal Court dealing with the same Facts involed in this action or otherwise relating to your imprisonment ?

   Yes ( )    No (✗)

**RECEIVED**

APR 3 0 2007
SC box
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

1

# PARTIES

Telly Guillory (plaintiff) is presently an African-American prisoner at Louisiana State Penitentiary and he is the plaintiff in this suit.

George W. Bush Jr. (defendant) is currently the president of the United States of America and he is being sued in his official capacity.

Kathleen Blanco is currently the Governor of the State of Louisiana and she is being sued in her official capacity.

The Louisiana Pardon Board is an administrative agency, and its current and active members are being sued in their official and individual capacity's.

The 20th Judicial District Court is a judicial agency and its current members are being sued in their official capacity.

The First Circuit Court of Appeal is a judicial agency and its current members are being sued in their official capacity.

The Louisiana Supreme Court is a judicial agency and its current and active members are being sued in their official capacity.

The U.S. Middle District Court of Louisiana is a judicial agency and its current members named herein are being sued in their official capacity.

The U.S. Fifth Circuit Court of Appeals is a judicial agency and its current and active members are being sued in their official capacity.

The U.S. Supreme Court is a judicial agency and its current and active members are being sued in their official capacity.

The defendants in this civil action were acting within the scope of their office and employment when the acts and ommissions complained of herein below were committed. Furthermore, the defendants named herein are being sued in their individual capacity for monetary damages.

# CONSTITUTIONAL AND STATUTORY PROVISION

U. S. C. A. Amendment I

U. S. C. A. Amendment V

U. S. C. A. Amendment VIII

U. S. C. A. Amendment IX

U. S. C. A. Amendment XIII

U. S. C. A. Amendment XIV

## Constitutional Articles

U.S. Constitutional Article I s. 9. cl 2.
U.S. Constitutional Article II s. 2. cl 2.
U.S. Constitutional Article IV s. 2
U.S. Constitutional Article III s.1

## Statutes

28 U.S.C.A. § 2254

Other
Louisiana Post Conviction Act

# JURISDICTION

This Honorable Court has jurisdiction pursuant to 42 U.S.C.A. § 1981, 42 U.S.C.A. § 1983, and 42 U.S.C.A. § 1985. Furthermore, this Court has jurisdiction under the Declaratory and Injunctive Relief Act pursuant to 28 U.S.C.A. §§ 2201-2202. This Court also has supplemental jurisdiction pursuant to 28 U.S.C.A. § 1331, 42 U.S.C.A. § 1343(a)(1)(2) and (3), and 28 U.S.C.A. § 1346(b)(2).

STATEMENT OF THE CASE

On March 19, 1998 plaintiff Telly Guillory was awaken by a disturbance coming from the lobby area in Camp-J. Gar 1-Right. Upon recognizing it was security officer's beating an inmate, Guillory began protesting in his cell.

Soon after three supervisors Captain David Ross, Lieutenant Willie Thomas and Lieutenant Randolph Beaubouef entered the unit, and one of them instantly began to spray chemical mace on the inmate.

Hearing the disturbance come from prisoner's on tiers 1-Right and Left. officer Ross went on that tier, with a can of mace and sprayed mace on the floor to quell the disturbance those prisoner's were making.

After Leaving 1-Left tier Ross came by 1-Right tier gate and and ordered Guillory, who was in cell-2 to quell his disturbance, but Guillory refused to do so. His defiance prompted Ross to come to Guillory's cell and spray mace on him.

In return Guillory fired a dart from a homemade blowgun at Ross which missed him and struck the wall behind him.

Surprisingly on June 2, 1998, Guillory was brought to St. Francisville Louisiana Police station and booked him with one count of aggravated battery.

6.

On July 11, 1998 Guillory was arraigned on the charge For allegedly shoting Ross on the center of his forehead with the dart he Fired at him.

On Seotember 22, 1998 Guillory went to trial For the aforesaid charge and was Found guilty by a six (6) member jury in State v. Guillory Docket No: W-98-6-254

On December 10, 1998 Guillory was multibilled as an Habitual OFFender pursuant to La. R.S. 15:529.1.

On February 4, 1999 Guillory was sentenced to LiFe in prison without benefit oF parole, probation or suspension oF sentence as a third oFFender.

On his direct appeal trial counsel Mr. Clayton Perkins argued that the states evidence was insuFFicient and the sentence is excessive. The First Circuit Court judges, however, denied the appeal. See State v. Guillory. 99-0939 (La. App. 1st Cir. 2/18/00) (opinion unpublished).

On certiorari to the Louisiana Supreme Court his writ was also denied in State v. Guillory 00-0739 (La. 9/29/00) 769 So.2d 1220.

On December 6, 2000 Guillory Filed his First Application For Post Conviction ReLieF claiming insuFFicient evidence, ineFFective assistance of counsel and the unconstitutionality of La. R.S. 14:2

On December 19, 2000 district judge Wilson Ramshur denied relief.

7.

Subsequently, Guillory appealed to the First Circuit Court of Appeals which appeal was denied in *State v. Guillory* 01-0719 (La. App. 1st Cir 8/9/2001).

Thereafter, Guillory appealed to the Louisiana Supreme Court who also denied his writ. *State v. Guillory* 01-2589 (La. 6/14/02).

During his post conviction appeals Guillory was able to obtain a copy of his trial transcript from his trial attorney. In it he realized David Ross' testimony along with that of officer's Thomas and Scott tremendously conflicted with each other, as well as with the physical evidence. In a last ditched effort to get the court to declare the evidence insufficient Guillory argued to the La. Supreme Court the conflict in the physical evidence on an application for rehearing, but it was denied.[1]

From there Guillory filed a Writ of Habeas Corpus in the U.S. Middle District Court located in Baton Rouge Louisiana. in it he raised the same claims as that in his post conviction. Magistrate judge Stephen C. Riedlinger accepted and presided over the case.[2]

On June 5, 2003 judge Riedlinger issued his report and recommendation denying all claims.

---

1.    All dates not listed herein are absent due, because Guillory was unable to obtain his property.

8.

From the mere manner in which judge Riedlinger had summarized the facts of the case, and leaving out the true statement Ross made that he jumped out of the booth after the dart struck him. Guillory felt the judge was intentionally ignoring the fact that the testimony Ross offerred strongly conflicted with the physical evidence. Therefore, on June 19, 2003 Guillory filed a subpeona duces tecum asking to see if the transcript had either been altered

Shortly thereafter a ruling was issued on the subpeona and in a footnote judge Riedlinger acknowledged that Ross did in fact testified he jumped back out of the booth. However, judge Riedlinger argued that the issue was immediately because 2 officer's withessed the dart hit Ross.

While this was taking place and Fustrated at the magistrates attempt to subvert his duty to correct a substantial injustice Guillory wrote judge John U. Parker several letters and told him about the magistrates actions. In direct disregards to that Judge Parker denied the writ on June 26, 2003.

From there Guillory filed notice of Appeal and a motion under Federal Rule of Civil Procedure Rule 52(a) seeking to have

2.   Judge Riedlinger also presided over a civil rights suit prior to Guillory's habeas corpus, that was against Ross and other guards for conspiracy and excessive force. The suit however was dismissed.

9.

insufficiency of evidence claim reviewed correctly. The motion was denied.

On Appeal to the U.S. Fifth Circuit Guillory argued that the magistrate committed error by intentionally refusing to correctly review the insufficiency of evidence claim under the proper standard established under *Jackson v. Virginia*. Furthermore Guillory argued the judge violate Article 3 of the constitution by his demonstrating bad faith and ignoring a serious miscarriage of justice.

On November 15. 2003 Fifth Circuit justice Ronald Demoss denied Guillory's application for certificate of appealability.

Soon after Guillory filed petition for rehearing, a panel of justices denied relief.

After this continued and fruitless effort to redress an investigation by the court justices. Guillory filed a judicial misconduct complaint against magistrate Riedlinger, but the chief justice of the fifth circuit denied the complaint.

Upon realizing the lower courts did not want to review the insufficiency of evidence under the proper standard Guillory filed a writ of Habeas Corpus, Mandamus, and certiorari with the U.S. Supreme Court

10.

There, the clerk of Court William K. Suter immedi-ately sent the writ of Habeas Corpus and mandamus back for Guillory to correct a few filling errors. After doing so, Guillory mailed the writs back. But again the clerk sent them back along with a letter telling Guillory the justices would only decide the certiorari. Despite understanding his purpose for filing all these pleading at one time in their court, the justices flat out denied certiorari on January 10. 2005.

While all of this was going on Guillory had filed a second Post Conviction Application Raising 13 claims for relief. At the time judge Ramshur recused himself from the case because Guillory filed a 1983 lawsuit against him for discrimination.

Therefore the case was assigned to district judge George H. Ware Jr. Yet even he too denied all claims on January 15, 2002. even though most of the claims required a hearing and were arguably sound claims that would have entitled Guillory to relief.

Thereafter Guillory filed a judicial complaint on judge Ware and the First Circuit judges for their misconduct in failing to apply the proper evidentiary standard for testing the sufficiency of evidence under the jurisprudence of Jackson v. Virginia.

The complaint was denied.

Subsequently, the First Circuit denied the appeal.

The Louisiana Supreme Court also denied certiorari.

From there Guillory filed a motion for authorization to file a second or successive writ of habeas corpus from the U.S. Fifth Circuit, but his motion was denied on January 7, 2004.

In his application, which was submitted was before the statutory time requirement for lifer's. Guillory noted for the Board that he was filing clemency early because the evidence in his case is insufficient and he's legally innocent.

On April 28, 2005 a decision was issued explaining to Guillory that he could reapply after serving 15 years on a life sentence, and thus the Board set a date for which to do so. on 2/4/2014.

From reading their decision, and by the quick time it took the Board to deny the application Guillory knew the Board had not read the facts and circumstances of the case he had attached to the request, but only read the clemency form, checked the date of sentence, and held Guillory's request was untimely.

12.

In June of 2005 Guillory wrote the Board and showed them they made a mistake, and misunderstood his intentions for filing clemency early. There was no provision under Louisiana law which prevented Guillory from submitting a clemency request early on a claim of insufficient evidence or legal innocence.

Nevertheless, the Board's administrative assistant Eileen McCarrol mailed Guillory a letter and asked him to please resubmit his request. It was apparent she knew he was right at asserting that the Board ignoring the brief attached to clemency form.

Unfortunately Guillory made several attempts to mail the request through classification officer's but they would confiscate it or throw it away. Ms. McCarrol would inform him that she never received any of his request so Guillory suspected Warden Cain was behind any attempt he made to show the injustice in this case . . . all because he, and the D.A. fear a lawsuit if Guillory were to . . . . be released from prison.

But finally on February 19, 2006. Guillory mailed his clemency request to the Board on his own. Although this time he did not include his trial transcript with his request because he no longer had any after sending his request and the transcripts to be mailed to the Board three times.

On February 24, 2006 the Board again took one day to deny the request. This time they issued a decision telling Guillory he could reapply in 7 years and thus set another new date (2/21/2013) From the date set in their April 2005 decision.

Upon noticing the Boards continued attempts to ignore reviewing his clemency request, and noticing the contracts in the dates Guillory understood that to mean the Board Felt he had already been heard in April. Since 2/14/14 was the 15 year due date to File clemency For Lifer. Plus the Board issued another decision on 2/23/2006 and noted that Guillory's clemency request did not present newly discovered evidence per La. R.S. 15: 574.4.

Guillory, wrote back to the assistant administrator a lenghtly Letter explaining to her that she Failed to inform the Board of her reason For asking Guillory to resubmit his application. And that that was why the Board incorrectly set the dates at odd, and denied the request.

The assistant wrote back and acknowledge to Guillory that the Boards decision was Final. Then she went on and corrected the dates herself.

Throughout this entire ordeal with the Pardon Board Guillory knew they had not reviewed his insufficiency of evidence claim, especially since they told him he didnt presently newly

discovered evidence. Guillory, although a pro se litigant is well known in both the state and federal courts for being a litigous political prisoner. He has been filings writs and suits for well over 13 years, therefore he is not lame to the law. There is no possible way to raise on "newly discovered evidence" claim. when the state failed to prove guilty beyond a reasonable doubt.

From all the efforts Guillory made and all the legal vehicles he used to challenge the unconstitutionality of his conviction it all turned out to be fruitless. Leaving him with no other alternative but to sue the judicial agency's through the state and federal government for violating the constitution and his constitutional rights.

The courts along with the Pardon Board intentionally knowingly, and willfully discriminated and conspired against Guillory by refusing to correct an obvious miscarriage of justice that was evident from the trial transcript itself.

Therefore, in direct dereliction of their duty to abide by the laws of this country, and treaties. the courts having violated the constitution leaves Guillory with no other vehicle but 42 U.S.C.A Section 1983 to sue for declaratory, injunctive and monetary relief.

The Courts in this case has refused to apply the correct evidentiary standard under Jackson v. Virginia by constantly holding that the officer's testimony's at trial supported each other. That was a far as their credibility findings went. However. the Courts never mentioned anything about whether the physical evidence supported their testimony's as Guillory has argued and pointed out to them in two rounds of Post Conviction and Habeas Corpus relief. a clemency request and the mailing of his case to the president and Govenor.

# THE LAW PERTAINING TO JACKSON V. VIRGINIA

The Law as pertaining to *Jackson v. Virginia* 443 U.S. 307 99 S.Ct. 2781. 61 L.Ed. 2d 560 (1979). establishes procedural guidelines for testing the sufficiency of evidence in criminal trials. In jury trials the trier of fact is charged to make credibility determination. Their determination must be made within the bounds of rationality, and not fantasy, conjecture, or speculation. Furthermore the triers of facts can choose to believe the testimony of any witness as long as that witness testimony is rational, logical and supported by the physical evidence.

However, when the jury is presented with irrational, incredible or otherwise illogical testimonial evidence, if there arises an internal contradiction or irreconcilable conflict with the physical evidence the jury is duty bound to reject the testimonial evidence and discharge the defendant.

Thus it follows that irrational, incredible and/or illogical testimonial evidence cannot be supported by evidence tending to show guilt, nor be justified by law.

Applying the Jackson standard for sufficiency of evidence in a criminal case Louisiana appellate court elects to provide only a minimal level of review. In cases where the conviction is based on circumstantial evidence La.R.S. 15:438. *See Stamp v. Camp* 446 So.2d 107. 1209 (La. 1984); *State v. Casey* 775 So.2d 1022 (La. 2000) each case must be reviewed with careful scrutiny.

In cases where credibility determinations are concerned appellate courts may impinge a jury's credibility findings to the extent necessary to guarantee the fundamental due process of Law. State v. Mussal 523 So.2d 1305. 1310 (La. 1988).

## Synopsis

Even though it was shown at trial that the physical evidence failed to support Officer David Ross irrational and incredible trial testimony, the jury still chose to believe he was shot on the forehead with a dart.

What is astonishing though is that when Guillory's trial attorney filed a motion for post verdict judgment of acquittal Judge Wilson Ramshur[3] deliberately chosed not to make any evidence determination.

Moreover, once Guillory filed direct appeal the First Circuit judge's decided to only review the consistency in the officer's testimony. And it is solely upon this determination the judge's felt rendered the evidence sufficient. No where in their decision did the judge's mention anything about whether the dart Ross alleged shot him supported his testimony. By the courts just agreeing to give "credibility" to the officer's and ignore the physical evidence, it has cost Guillory eight years trying

---

3.   Judge Ramshur is now deceased

to get the courts to admit whether the physical evidence supports Ross' testimony or not, or Guillory's testimony that he shot the wall.

The Facts outlined below will help this Court to make its own determination.

In order to fully understand the matter before the Court Petitioner will detail the Facts and Circumstances of his case to show the State Failed to prove guilt beyond a reasonable doubt.

Petitioner Telly Guillory was brought to court in St. Francisville, Louisiana to face a charge of aggravated battery; that is a battery committed with a dangerous weapon. In order to prove its case the prosecutor had to show that the battery was the result of an intentional use of force or violence upon the person of another: or the intentional administration of a poison or other obnoxious liquid or substance to another. LSA-R.S. 14:34. and 14:2(3).

Trial started with officer Gerald Scott alleging he seen a dart fly from petitioner's cell and strike Ross on the forehead. Tr. p. 28

Asked by the prosecutor Mr. Richard Howell what he found on the scene officer Scott replied: "What i found was, well i actually saw the uh dart hit Captain Ross in the forehead area. After it was over with, after the confrontation was over with i searched his cell and found two more darts."

MR. HOWELL.  Q.  Where did you find these objects?

MR. SCOTT.  A.  Uh, the two darts were on his, on his bed. The dart that hit Captain Ross was on the tier.

18.

Q    I see. You actually saw this person Fire:
the blow, the blowgun at Captain Ross?

A.    I didn't actually see the person because
the way the cell is. I saw the dart come
out of the cell door and hit the Captain.

Tr. p. 33.

Thomas too confirmed this on direct examination by the
prosecutor when he was asked:

Q.    All right. You were in a position that you
could see inmate Guillory?

A.    No. sir, i couldn't see inmate Guillory, i
could see everything coming out of the cell.

Tr. p. 35.

What Scott and Thomas meant to show the jury was that
they seen a dart Fly out the First door connected to the booth
itself and hit Ross while he was standing on the tier. Had they
would have placed Ross on the tier at the time they allegedly
s-e-e-n a dart hit him, the physical evidence would have
supported them.

The only person who acknowledged seeing Guillory in
the cell was David Ross when he testified on direct examination
by the prosecutor:

1.    Ross Unusual Occurrence Report mimics his
testimony that he jumped out the booth. See Exhibit (A).

19.

Asked to describe what occurred that day Scott testified:

> A. Okay. Uh, inmate Guillory was racking down his cell, uh hammering --.

> Q. Can you tell us what that means, racking down your cell?

> A. He was either hammering on his, on his bed, on his steel frame, or on the plate. I couldn't see exactly what he was hitting, but he was causing a disturbance on the tier.

> Q. You know that it was Telly Guillory.

> A. Yes, sir.

> Q. How do you know that?

> A. Uh, well, he was in the first cell, cell # 2, and it's uh quite obvious where the noise was coming from.

Tr. p. 29.

From this line of questioning it can be interpreted that Scott could not see Guillory in the cell, but only knew he was in it because of the noise coming from within it. However, asked later was he at the cell with Ross, Scott replied "Yes, sir, i was." Id. Although he never described where he was standing at, his failure to say so turned fatal later on.

At first the jury was led to believe Guillory fired one dart, but asked further how many darts were fired Scott answered "One initially was shot, the one that hit him. When he shut the door we heard other, other uh darts hit the door." Tr. p. 30.

Next to take the stand was Officer Willie Thomas who was asked on direct examination by the prosecutor to tell the jury what he witnessed, he testified:

20.

A. Well, uh Captain Ross and myself were called to the unit due to having a security problem with another inmate. We come to the unit together and we were in the process of handling the situation with the other inmate when Mr. Guillory started beating down, racking, cursing and pretty much calling for us to come to his cell, because by being in Camp-J for so long he knew the next step was for us to quell the disturbance he was causing. And uh Captain Ross went to the cell and ordered him to stop and he didn't and he used a few other choice words, so Captain Ross left the tier.

Q. What words did he use?

A. Uh, stuff like " You bitches don't like to mess with me, your scared of me", and all this kind of stuff uh due to his prior history of throwing stuff at officers like human waste and stuff like that. I think maybe less than two weeks prior to this incident he threw human waste on the captain on the other shift. Uh, and uh Captain Ross left the tier and returned with a can of mace and ordered Guillory to stop and he continued.

Q. What was he doing after he asked him to stop?

A. Beating down and continually cursing.

Q. All right.

A. Uh, Captain Ross come back and ordered him to stop and he didn't, and the next step was whenever he used the mace. And as he was using the mace inmate Guillory shot him in the face with a

21.

dart. Captain Ross jumped back and attempted to close the door, because the cell he's in is an isolation cell that has a steel door outside of the bar, and as Captain Ross attempted to slam the door to keep anything else from coming out, another dart hit the door as it was slamming. So, he reloaded and shot another one.

Q. All right. You were in a position that you could see inmate Guillory?

A. No sir, i couldn't see inmate Guillory, i could see everything coming out of the cell.

Tr. pp. 34-35

Officer Thomas' testimony provided the first lengthly description of what he alleged occurred, but in his haste and benign effort to cast such a disgusting light upon Guillory to inflame the jury, he failed to mention a critical piece of evidence i.e. where he actually seen Ross standing at the time he allegedly seen a dart hit him. A fact much needed for the State which will prove fatal later on too.

Nevertheless, on cross-examination by Mr. Perkins, (defense counsel) of Thomas, it was asked how far away was he standing when he seen the dart come out the cell, he said "Approximately five feet." Tr. p. 36.

Then surprisingly he later described to the jury the structure of the cell, another crucial issue in the case.

22.

Q. And you closed the large door?

A. No, sir. Captain Ross did.

Q. You saw him close that then?

A. I was standing a couple of feet from him.

Q. And that's a solid door, is that right?

A. It's a solid steel door.

Q. The door, the door that goes into the cell has just got bars on it, is that right?

A. Right. Well, with these particular cells, they were once used as isolation cells. Okay. They would have bars outside of the cell itself and then there's another enclosure that has a steel door where you can totally isolate him from everything. But those doors are rarely used any more.

Q. That was the one that was used to close at this time?

A. That was the one he closed to keep from being shot.

Tv. p. 38

Although the prosecutor oddly chosed not to take any picture's for the jury to see the cell or the tier area, the jury had enough information to determine the cell has two doors; one connected to the front section of the cell and another to the cell itself which confines Guillory

23.

Last of the States witness to testify was David Ross, and in his testimony alone it will be shown that there was no possible way under the laws of nature that Scott and Thomas could have seen a dart strike Ross on the forehead. Asked by prosecutor Howell on direct examination to explain his version of events Ross testified:

A.    On that date i was called to Gar unit at Camp-J, a disciplinary camp, inmate Telly Guillory, i mean uh inmate, there was another inmate having a problem there. All right. In the process of handling that problem with the other inmate, inmate Telly Guillory was racking down causing a disturbance, beating and stuff. I went to his cell, i told him to cease the disturbance. He continued to cause a disturbance and everything.

Q.    Can you tell us what he was doing with the disturbance.

A.    He was beating, he was taking something and he was beating the sink, its a metal sink. petition, you know, sink and everything, and stomping on his bed, racking the bars, shaking the bars and everything. And i told him well anyway, i told him to cease the disturbance and everything. I left the tier and got a can of mace. Freeze II. I went back to the cell and give him more orders to cease the

24.

disturbance. He still didn't cease the disturb-
ance so i was Forced to spray a second burst
of Freeze II, or mace into his cell to get him
to hold the noise down. At that time i sprayed
the mace he shot me with a dart right here. And
i then jumped back out of the boot, its a boot.
its a cell, its got a door in front of the cell
that you can shut and confines the cell, restricts
the cell. So, i then jumped back out of the booth
shut the door and another dart hit the, i heard
another dart hit the door then. So, i then come
out on the tier...

Tr. p 38


    The State's case was already weak from the very beginning.
During Ross' Lenghtly testimony the prosecutor never even realized
the fatal error in Ross' version when he twice said "i then jumped
back out of the boot" (its suppose to be spelled 'booth'). This fatal
statement by itself was the needle that broke the camels back. And
the prosecutor was dutifully required to impeach Ross... he didnt.
Consequently, this statement meant Ross was standing inside the
structure situated in front of the cell. The area outside of the booth
is the tier where Scott said he found the dart.[1]


    Never once did Scott or Thomas testify that they were
inside the booth with Ross, or where exactly Ross was standing
when they allegedly s-e-e-n a dart hit him. So it can only be
concluded that Scott and Thomas was on the tier while Ross was
in the booth.


    This line of reasoning is confirmed by Scott when Mr.
Perkins asked him on cross-examination.

Q. You saw him in the cell?

A  Yes, sir.

Q   All right. And thats the same person that was removed from the cell?

A.  Yes, sir.

Tr. p. 38.

The only reason Ross was the only person to see Guillory was because he was the only one to walk through the booth door. But that's not all, the prosecutor still never paid attention to Ross' testimony even though Scott said earlier he found the dart he seen hit Ross on the tier. Yet on direct examination Ross claimed he found the dart:

Q.   All right, Did you get a look at the darts?

A.   Yes.

Q.   That day?

A.   Yes sir. Well, the dart i was shot with i retrieved it. And after inmate Guillory was in the shower i sent Sergeant Gerald Scott back into the cell to shake it down. And the other two darts and the blowgun was retrieved out his mattress.

Tr. p. 39

Since Ross claimed he was inside the booth at the time he alleged he was shot, it is only logical to ~~conclude~~ assume that he found the dart in the booth.[2] However, two darts and a blowgun were

26.

reported found in Guillory's cell underneath his mattress, according to both Scott and Ross. And, only one dart was alleged to have been fired that struck Ross. Yet these two officer's are claiming they found the same dart, but in different area's. Never once did the prosecutor or defense counsel question these officer's conflicting statements. So under the circumstances the jury was totally unable to even determine who was telling the truth.

Next we turn to the most outstanding aspect of this case. All three officers made it appear to the jury that Guillory shot Ross in the face with a dart immediately after Ross sprayed him. Any rational minded person would have instantly questioned the possibility and plausibility of these seemingly absurd allegations. Keep in mind though, that to accomplish pointing a weapon at a persons face, timing and speed is required. And thats not all, all human beings respect pain. It is presumed by law that no sane human being will willfully nor voluntarily stand in the way of apparent danger, unless that person is either (1) Insane, (2) Blind, or (3) unable to see because of some physical object obstructing their view.

Once Ross entered the booth with his can of mace to spray Guillory, he never said he seen a blowgun in Guillory's hand, nor did he say he was blind, insane, or unable to see through the cell bars; cause that's the only object standing between them. By the prosecutor failing to present sufficient evidence for the jury to infer that Ross was shot because of these reasons; there was no way they could have believed Ross stood in that booth and ignored Guillory bringing the weapon from behind his back. To say he

---

2.    There was no report written verifying Ross retrieved a dart.

27.

Let Guillory, whom he just maced, point a loaded weapon at his face and never once attempted to avoid physical danger, is absolutely absurd.

Remember, Ross said he came to Guillory's cell with mace to quell a disturbance, not because he seen him with a blowgun. Quite naturally by being a correctional officer had he would have seen Guillory standing in the cell exposing a blowgun to him, he would have ordered him to hand it over. So obviously Guillory had it hid from view, just as he testified to:

In the most longest and drawned out version Guillory testified that he was standing by his cell bars facing Ross when he came to the cell. Once there, Ross stated "Didn't i tell you quit making that noise" Tr. pp. 42-43. At which time Guillory admitted making noise, and that Ross was mad at him for protesting what they were doing to the other inmate in the lobby. Guillory knew Ross was going to mace him because Ross was armed with mace the very first movement he came to the cell. However he admitted to only cursing and hollering at the officer's and not jumping on his bed, racking the bars or beating on the sink, but that other inmates were causing a disturbance just as well. Tr. p. 44. He further testified that someone at the tier gate opened it and let Ross and Thomas on the tier. When Ross entered the booth, it was Thomas, not Scott, who stood outside the booth next to the door entrance. Also, according to Guillory Ross never gave him several direct verbal orders to cease a disturbance, yet only told him once "Didn't i tell you go back with the noise" Tr. p. 44. At that time Ross quickly maced Guillory.

Then defense counsel asked him:

Q.   What did you do in return?

A.   Huh?

Q.   What did you do after that?

A.   When he sprayed me with mace i came from
     behind my back with the dartgun and
     when Ross seen the dart gun he jumped out
     the boot. When he jumped out the boot i shot at
     him. When i shot at him he ducked himself.
     And when he ducked himself the dart hit the
     wall. It never hit him in the forehead. And
     I'm looking dead at him when he did it.
     He said earlier that he heard other things
     hitting the wall, it wasn't the darts that
     was coming out the dart gun, it was bars
     of soap. I had bars of soap and a tube
     of toothpaste lined up at my bars. So, when
     Ross came to spray me with the mace, i had
     the darts on my bed, under the mattress, like
     and on my bed. When i shot that one, i wasn't
     gonna reach back down and get the other one
     because he had sprayed me in the face with that
     mace, and that mace closed my eyes up. So, when
     i laid up there and shot the dart, i had the bars
     of soap right there on side the wall, i had took
     the bars of soap and started throwing at them,
     that's what they heard hit the wall.

Tr. p. 45

29.

As clearly seen from Guillory's testimony, the jury had all it needed to disbelieve Ross' bizarre testimony where he appears to just allowed himself to get shot in the face. Guillory did not shoot a dart while Ross was inside the booth, but only after he jumped out of it. In order to come from behind his back with the blowgun, put it to his mouth, stick it through the cell bars, get a perfect aim on Ross and then shoot him bullseye, right between the eyes where he pointed to for the jury, necessarily required speed, the advantage of surprise, or just plain insanity on the part of David Ross. The D.A., didn't prove he was insane, nor caught by surprise either.

Had Ross would have testified he jumped back out of the booth, then afterwards was shot in the face, the jury could have believed him. Had he would have said this he would have provided a reasonable basis for the jury to infer his <u>initial reaction</u> to seeing Guillory brandish the blowgun. An inference that would have also provided a logical explanation of how the dart ended up being found outside the booth on the tier. Neither Thomas or Scott ever said they seen Ross enter the booth, nor even jumped out of it. Therefore the jury was left with the incredible, contradictory and totally unsubstantiated testimony of David Ross that failed to support the physical evidence. See <u>State v. Mussal</u>, 514 So.2d 505 (4th Cir. 1987).

The record clearly shows Officer Scott was not speaking of finding a dart inside the booth where Ross placed himself, because when asked on cross-examination by Mr. Perkins did he find a dart that hit the steel door once it was completely closed, he testified:

Q.    It sounds like you should have four then. One hit the one. the one that hit the door, did you find it on the floor there when you went to investigate?

A.    No. I'm assuming he. I'm assuming he got it
back.

Tr. p. 33.

It is hard to tell who Scott was referring to, but without
a doubt, he did not find any dart at all inside the booth area period.
Furthermore, his disciplinary report confirms he found (3) three darts,[4]
therefore Ross' self-serving testimony that he retrieved the dart that
struck him is evidently false. Common sense and the facts dictate, that
the dart Scott found on the tier is the dart Guillory shot at the wall.

This Court has the record before it, and ample reasons
to declare the prosecutor failed to prove the essential element of
aggravated battery, i.e. physical contact upon the person David Ross
with a dangerous weapon. With this in mind this Court should reverse,
and discharge petitioner as required by *Jackson v Virginia*, and
*In re Winship*. Naturally, once the dart hit the wall it would fall on
the tier floor. That proved Guillory was/is innocent.

---

4.  See Report Exhibit (B).

# DECLARATORY RELIEF

The defendants in this suit while working under color of state and Federal Law violated Guillory's constitutional rights when they conspired and discriminated to violate the constitution, Laws and treaties of this country.

The defendants in this suit while working under color of state and Federal Law intentionally violated the constitution by refusing to correct an error they knew would have inflicted severe pain and hardship on plaintiff.

The defendants in this suit while working under color of state and Federal Law violated Guillory's Fifth Amendment right when they refused to afford him the equal protection of the Law.

The defendants in this suit while working under color of state and Federal Law violated Guillory's Eight Amendment right when they subjected him to cruel and unusual punishment and thus left him to suffer continuously for the rest of his Life for a crime they know was never proven to have occurred.

The defendants in this suit while working under color of state and Federal Law violated Guillory's Ninth Amendment right when they intentionally and persistently denied him the fair administration of the law as guaranteed to all citizens of this country.

The defendants in this action while working under color of state and Federal Law violated Guilbry's Thirteenth Amendment right when they subjected him to slavery and involuntary servitude by deliberately allowing him to suffer the punishment of a unconstitutional Life sentence on a criminal charge for which the State of Louisiana failed to prove guilt beyond a reasonable doubt.

The defendants in this case while acting under color of state and Federal Law, violated Guillory's fourteenth Amendment right when they denied him the due process and equal protection of the Law by refusing to correct a miscarriage of justice.

The defendant George Bush as president of the United State of America is responsible for the acts and inactions of the judges in the herein named Federal courts through the laws and treaties of this country confered in U.S. Const. Article II §2 cl 2.

The defendants Kathleen Blanco, as govenor of the state of Louisiana is responsible for the acts and inactions of the judges in the herein named State Courts through the laws and treaties of this state

The defendants in this suit while working under color of state and Federal Law intentionally violated U.S. Constitution Article IV s2 by conspiring and discriminating against Guillory by refusing to afford him the priveleges and immunities of the Law when he was constantly denied Post Conviction and Habeas Corpus relief by not providing him a hearing on the argument his presented and/or by refusing to apply the correct standard of statutory and Federal Law as in all other cases.

The defendant State of Louisiana is responsible for the acts and inactions of state actors and employees

The defendants in this suit while acting under color of state and Federal Law intentionally violated U.S. Const. Article III s.1 when they performed their judicial duties in bad faith and caused a prisoner to suffer illegal punishment

## INJUNCTIVE RELIEF

Plaintiff prays that this Honorable Court will order the defendants to declare that his conviction is invalid and his sentence illegal.

Plaintiff prays that this Honorable Court will order the defendants to admit that they allowed an injustice to occur to deprive Guillory of his Liberty.

Plaintiff prays that this Honorable Court will order the defendants to review or reconsider and apply the proper evidentiary standard of Jackson v. Virginia to his case.

Plaintiff prays this court will provide the necessary relief it deems adequate in this case.

Respectfully submitted

Telly Guillory #320441
Camp-C Jaguar 1-R-10
Louisiana State Prison
Angola, La. 70712

34.

RELIEF

State briefly exactly what you want the court to do for you. MAKE NO LEGAL ARGUMENTS. CITE NO CASES OR STATUTES.

Plaintiff prays for Declaratory and Injunctive Relief specified above. Plaintiff further prays that this court award him punitive damages in the amount of $ 25.000,000,00 (dollars) for past and present and future injury as a result of their acts and inactions.

Signed this ____14th____ day of ____April____ 2007.

_____ #320441
(Signature of Plaintiff)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on: _____ #320441
Signature of Movant

07-780
HHK

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

*Telly Guillory*

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

*Pro Se (PR)*

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
#320441

**DEFENDANTS**

*George W. Bush, Jr. et al*

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

A

Case: 1:07-cv-00780
Assigned To : Kennedy, Henry H.
Assign. Date : 4/20/2007
Description: PRO SE GEN. CIVIL

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)

(⊙) U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENS**
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☐ E. General Civil (Other) OR (⊙)F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
(⊙) 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (If not administrative agency review or Privacy Act

(11)

<table>
<tr><td>

☐ **G. Habeas Corpus/ 2255**

☐ 530 Habeas Corpus-General
☐ 510 Motion/Vacate Sentence

</td><td>

☐ **H. Employment Discrimination**

☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)

*(If pro se, select this deck)*

</td><td>

☐ **I. FOIA/PRIVACY ACT**

☐ 895 Freedom of Information Act
☐ 890 Other Statutory Actions (if Privacy Act)

*(If pro se, select this deck)*

</td><td>

☐ **J. Student Loan**

☐ 152 Recovery of Defaulted Student Loans (excluding veterans)

</td></tr>
<tr><td>

☐ **K. Labor/ERISA (non-employment)**

☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Labor Railway Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

</td><td>

☐ **L. Other Civil Rights (non-employment)**

☐ 441 Voting (if not Voting Rights Act)
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights
☐ 445 American w/Disabilities-Employment
☐ 446 Americans w/Disabilities-Other

</td><td>

☐ **M. Contract**

☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholder's Suits
☐ 190 Other Contracts
☐ 195 Contract Product Liability
☐ 196 Franchise

</td><td>

☐ **N. Three-Judge Court**

☐ 441 Civil Rights-Voting (if Voting Rights Act)

</td></tr>
</table>

**V. ORIGIN**

⊙ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ Multi district Litigation    ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint   **JURY DEMAND:** ☐ YES ⊙ NO

**VIII. RELATED CASE(S) IF ANY** *p.F.* (See instruction)    ☐ YES ⊙ NO    If yes, please complete related case form.

DATE *1.20.07*    SIGNATURE OF ATTORNEY OF RECORD *NCD*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd

