UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLOMBIA

**RECEIVED**

JUN 1 1 2007

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Telly Guillory
          Plaintiff

Docket No: 07cv-00780 HHK

Versus

George W. Bush Jr. et al
          Defendant

## MOTION TO AMEND

NOW INTO COURT comes plaintiff Telly Guillory pursuant to rules 15(a) and 19(a) Fed. R. Civ. P. requests leave to file an amended complaint adding a claim of:

(i) Invidious discriminatory animus by the defendants.

This Court should grant leave freely to amend a complaint pursuant to Forman v. Davis 371 U.S. 178, 182, 83 S. Ct. 227 (1962) Interroyal Corp v. Sponseller 889 F. 2d 108, 112 6th Cir.), cert denied 494 U.S. 1091 (1990).

Respectfully submitted

Telly Guillory #320441
Telly Guillory #320441

## CERTIFICATE OF SERVICE

I certify that a copy of the Foregoing has been mailed to: Hon. Nancy Mayer Whittington Clerk of Court. 333 Constitution Avenue. N. W. Washington, D.C. 20001 by U.S. mail postage prepaid this 6 day of ___June___ 2007.

s/ Telly Guillory #320441
Telly Guillory #320441

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
COLOMBIA

Telly Guillory
_____
_____
_____

Plaintiff

Docket No: _____
Magistrates _____
Judge: _____
Division: _____

versus

George W. Bush, Jr.
Kathleen Blanco
Louisiana Pardon Board
20th Judicial District Court
First Circuit Court of Appeal
Louisiana Supreme Court
U.S. Middle District Court
U.S. Fifth Circuit Court
U.S Supreme Court

Defendant(s)

Case: 1:07-cv-00780
Assigned To : Kennedy, Henry H.
Assign. Date : 4/20/2007
Description: PRO SE GEN. CIVIL

COMPLAINT

1. Previous Lawsuits:

a. Have you begun other lawsuits in state or Federal Court dealing with the same Facts involved in this action or otherwise relating to your imprisonment?

Yes ( )   No ( X )

1.

# PARTIES

Telly Guillory (plaintiff) is presently an African-American prisoner at Louisiana State Penitentiary and he is the plaintiff in this suit.

George W. Bush Jr. (defendant) is currently the president of the United States of America and he is being sued in his official capacity.

Kathleen Blanco is currently the Governor of the State of Louisiana and she is being sued in her official capacity.

The Louisiana Pardon Board is an administrative agency and its current and active members are being sued in their official and individual capacity's.

The 20th Judicial District Court is a judicial agency and its current members are being sued in their official capacity.

The First Circuit Court of Appeal is a judicial agency and its current members are being sued in their official capacity.

The Louisiana Supreme Court is a judicial agency and its current and active members are being sued in their official capacity.

The U.S. Middle District Court of Louisiana is a judicial agency and its current members named herein are being sued in their official capacity.

The U.S. Fifth Circuit Court of Appeals is a judicial agency and its current and active members are being sued in their official capacity.

The U.S. Supreme Court is a judicial agency and its current and active members are being sued in their official capacity.

The defendants in this civil action were acting within the scope of their office and employment when the acts and ommissions complained of herein below were committed. Furthermore, the defendants named herein are being sued in their individual capacity for monetary damages.

# CONSTITUTIONAL AND STATUTORY PROVISION

U.S.C.A. Amendment I

U.S.C.A. Amendment V

U.S.C.A. Amendment VIII

U.S.C.A. Amendment IX

U.S.C.A. Amendment XIII

U.S.C.A. Amendment XIV

## Constitutional Articles

U.S. Constitutional Article I s.9. cl.2.
U.S. Constitutional Article II s.2. cl.2.
U.S. Constitutional Article IV s.2
U.S. Constitutional Article III s.1

## Statutes

28 U.S.C.A. § 2254

## Other

Louisiana Post Conviction Act

# JURISDICTION

This Honorable Court has jurisdiction pursuant to 42 U.S.C.A. § 1981, 42 U.S.C.A § 1983, and 42 U.S.C.A § 1985. Furthermore, this Court has jurisdiction under the Declaratory and Injunctive Relief Act pursuant to 28 U.S.C.A. §§ 2201-2202. This Court also has supplemental jurisdiction pursuant to 28 U.S.C.A § 1331, 42 U.S.C.A § 1343(a)(1)(2) and (3), and 28 U.S.C.A § 1346 (b)(2).

STATEMENT OF THE CASE

On March 19, 1998 plaintiff Telly Guillory was awaken by a disturbance coming from the lobby area in Camp-J. Gar 1-Right. Upon recognizing it was security officer's beating an inmate, Guillory began protesting in his cell.

Soon after three supervisors Captain David Ross, Lieutenant Willie Thomas and Lieutenant Randolph Beaubouef entered the unit, and one of them instantly began to spray chemical mace on the inmate.

Hearing the disturbance come from prisoner's on tier's 1-Right and Left, officer Ross went on that tier, with a can of mace and sprayed mace on the floor to quell the disturbance those prisoner's were making.

After leaving 1-Left tier Ross come by 1-Right tier gate and and ordered Guillory, who was in cell-2 to quell his disturbance, but Guillory refused to do so. His defiance prompted Ross to come to Guillory's cell and spray mace on him.

In return Guillory fired a dart from a homemade blowgun at Ross which missed him and struck the wall behind him.

Suprisingly on June 2, 1998, Guillory was brought to St. Francisville Louisiana Police station and booked him with one count of aggravated battery.

On July 11, 1998 Guillory was arraigned on the charge for allegedly shoting Ross on the center of his forehead with the dart he fired at him

On Seotember 22, 1998 Guillory went to trial for the aforesaid charge and was found guilty by a six (6) member jury in State v. Guillory Docket No: W-98-6-254

On December 10, 1998 Guillory was multibilled as an Habitual Offender pursuant to La. R.S. 15:529.1.

On February 4, 1999 Guillory was sentenced to life in prison without benefit of parole, probation or suspension of sentence as a third offender.

On his direct appeal trial counsel Mr. Clayton Perkins argued that the states evidence was insufficient and the sentence is excessive. The First Circuit Court judges, however, denied the appeal. See State v. Guillory. 99-0939 (La. App. 1st Cir. 2/18/00) (opinion unpublished).

On certiorari, to the Louisiana Supreme Court his writ was also denied in State v. Guillory 00-0739 (La. 9/29/00) 769 So.2d 1220.

On December 6, 2000 Guillory filed his First Application for Post Conviction Relief claiming insufficient evidence, ineffective assistance of counsel and the unconstitutionality of La. R.S. 14:2

On December 19, 2000 district judge Wilson Ramshur denied relief.

Subsequently, Guillory appealed to the First Circuit Court of Appeals which appeal was denied in *State v. Guillory* 01-0719 (La. App. 1st Cir 8/9/2001).

Thereafter, Guillory appealed to the Louisiana Supreme Court who also denied his writ. *State v. Guillory* 01-2589 (La 6/14/02).

During his post conviction appeals Guillory was able to obtain a copy of his trial transcript from his trial attorney. In it he realized David Ross' testimony along with that of officer's Thomas and Scott tremendously conflicted with each other, as well as with the physical evidence. In a last ditched effort to get the court to declare the evidence insufficient Guillory argued to the La. Supreme Court the conflict in the physical evidence on an application for rehearing, but it was denied.[1]

From there Guillory filed a Writ of Habeas Corpus in the U.S. Middle District Court located in Baton Rouge Louisiana. in it he raised the same claims as that in his post conviction. Magistrate judge Stephen C. Riedlinger accepted and presided over the case.[2]

On June 5, 2003 judge Riedlinger issued his report and recommendation denying all claims.

---

1.    All dates not listed herein are absent due because Guillory was unable to obtain his property.

From the mere manner in which judge Riedlinger had summarized the facts of the case, and leaving out the true statement Ross made that he jumped out of the booth after the dart struck him. Guillory felt the judge was intentionally ignoring the fact that the testimony Ross offerred strongly conflicted with the physical evidence. Therefore, on June 19, 2003 Guillory filed a subpeona duces tecum asking to see if the transcript had either been altered

Shortly thereafter a ruling was issued on the subpeona and in a footnote judge Riedlinger acknowledged that Ross did in fact testified he jumped back out of the booth. However, judge Riedlinger argued that the issue was immediately because 2 officer's witnessed the dart hit Ross.

While this was taking place and frustrated at the magistrates attempt to subvert his duty to correct a substantial injustice Guillory wrote judge John V. Parker several letters and told him about the magistrate's actions. In direct disregards to that Judge Parker denied the writ on June 26, 2003.

From there Guillory filed notice of Appeal and a motion under Federal Rule of Civil Procedure Rule 52(a) seeking to have

2.    Judge Riedlinger also presided over a civil rights suit prior to Guillory's habeas corpus, that was against Ross and other guards for conspiracy and excessive force. The suit however was dismissed.

9.

insufficiency of evidence claim reviewed correctly. The motion was denied.

On Appeal to the U.S. Fifth Circuit Guillory argued that the magistrate committed error by intentionally refusing to correctly review the insufficiency of evidence claim under the proper standard established under *Jackson v. Virginia*. Furthermore Guillory argued the judge violate Article 3 of the constitution by his demonstrating bad faith and ignoring a serious miscarriage of justice.

On November 13, 2003 Fifth Circuit justice Ronald Demoss denied Guillory's application for certificate of appealability.

Soon after Guillory filed petition for rehearing, a panel of justices denied relief.

After this continued and fruitless effort to redress an investigation by the court justices. Guillory filed a judicial misconduct complaint against magistrate Riedlinger, but the chief justice of the fifth circuit denied the complaint.

Upon realizing the lower courts did not want to review the insufficiency of evidence under the proper standard Guillory filed a writ of Habeas Corpus, Mandamus, and certiorari with the U.S. Supreme Court

10.

There, the clerk of Court William K. Suter immediately sent the writ of Habeas Corpus and mandamus back for Guillory to correct a few filling errors. After doing so, Guillory mailed the writs back. But again the clerk sent them back along with a letter telling Guillory the justices would only decide the certiorari. Despite understanding his purpose for filing all these pleading at one time in their court, the justices flat out denied certiorari on January 10, 2005.

While all of this was going on Guillory had filed a second Post Conviction Application Raising 13 claims for relief. At the time judge Ramshur recused himself from the case because Guillory filed a 1983 lawsuit against him for discrimination.

Therefore the case was assigned to district judge George H. Ware Jr. Yet even he too denied all claims on January 15, 2002, even though most of the claims required a hearing and were arguably sound claims that would have entitled Guillory to relief.

Thereafter Guillory filed a judicial complaint on judge Ware and the First Circuit judge's for their misconduct in failing to apply the proper evidentiary standard for testing the sufficiency of evidence under the jurisprudence of Jackson v. Virginia.

The complaint was denied.

11.

Subsequently, the First Circuit denied the appeal.

The Louisiana Supreme Court also denied certiorari.

From there Guillory Filed a motion For authorization to File a second or successive writ of habeas Corpus From the U.S. Fifth Circuit, but his motion was denied on January 7, 2004.

In his application, which was submitted was beFore the statutory time requirement For LiFer's, Guillory noted For the Board that he was Filing clemency early because the evidence in his Case is insufficient and he's legally innocent.

On April 28, 2005 a decision was issued explaining to Guillory that he could reapply aFter serving 15 years on a LiFe sentence, and thus the Board set a date For which to do so. on 2/4/2014.

From reading their decision, and by the quick time it took the Board to deny the application Guillory knew the Board had, not read the Facts and circumstance's oF the case he had attached to the request, but only read the clemency Form, checked the date oF sentence, and held Guillory's request was untimely.

In June of 2005 Guillory wrote the Board and showed them they made a mistake, and misunderstood his intentions for filing clemency early. There was no provision under Louisiana Law which prevented Guillory from submitting a clemency request early on a claim of insufficient evidence or legal innocence.

Nevertheless, the Board's administrative assistant Eileen McCarrol mailed Guillory a letter and asked him to please resubmit his request. It was apparent she knew he was right at asserting that the Board ignoring the brief attached to clemency form.

Unfortunately Guillory made several attempts to mail the request through classification officer's but they would confiscate it or throw it away. Ms. McCarrol would inform him that she never received any of his request. So Guillory suspected Warden Cain was behind any attempt he made to show the injustice in this case... all because he, and the D.A. fear a lawsuit if Guillory were to.... be released from prison.

But finally on February 19, 2006. Guillory mailed his clemency request to the Board on his own. Although this time he did not include his trial transcript with his request because he no longer had any after sending his request and the transcripts to be mailed to the Board three times.

13.

On February 24, 2006 the Board again took one day to deny the request. This time they issued a decision telling Guillory he could reapply in 7 years and thus set another new date (2/21/2013) From the date set in their April 2005 decision.

Upon noticing the Boards continued attempts to ignore reviewing his clemency request and noticing the contracts in the dates Guillory understood that to mean the Board felt he had already been heard in April. Since 2/14/14 was the 15 year due date to file clemency for Lifer. Plus the Board issued another decision on 2/23/2006 and noted that Guillory's clemency request did not present newly discovered evidence per La. R.S. 15: 574.4.

Guillory, wrote back to the assistant administrator a lenghtly letter explaining to her that she failed to inform the Board of her reason for asking Guillory to resubmit his application. And that that was why the Board incorrectly set the dates at odd, and denied the request.

The assistant wrote back and acknowledge to Guillory that the Boards decision was Final. Then she went on and corrected the dates herself.

Throughout this entire ordeal with the Pardon Board Guillory knew they had not reviewed his insufficiency of evidence claim. especially since they told him he didn't presently newly

discovered evidence. Guillory, although a pro se litigant is well known in both the state and federal courts for being a litigous political prisoner. He has been filings writs and suits for well over 13 years, therefore he is not lame to the law. There is no possible way to raise any "newly discovered evidence" claim. when the state failed to prove guilty beyond a reasonable doubt.

From all the efforts Guillory made and all the legal vehicles he used to challenge the unconstitutionality of his conviction it all turned out to be fruitless. Leaving him with no other alternative but to sue the judicial agency's through the state and federal government for violating the constitution and his constitutional rights.

The courts along with the Pardon Board intentionally knowingly, and willfully discriminated and conspired against Guillory by refusing to correct an obvious miscarriage of justice that was evident from the trial transcript itself.

Therefore, in direct dereliction of their duty to abide by the laws of this country, and treaties. the courts having violated the constitution leaves Guillory with no other vehicle but 42 U.S.C.A Section 1983 to sue for declaratory, injunctive and monetary relief.

The Courts in this case has refused to apply the correct evidentiary standard under Jackson v. Virginia by constantly holding that the officer's testimony's at trial supported each other. That was as far as their credibility findings went. However, the Courts never mentioned anything about whether the physical evidence supported their testimony's as Guillory has argued and pointed out to them in two rounds of Post Conviction and Habeas Corpus relief. a clemency request and the mailing of his case to the president and Govenor.

# THE LAW PERTAINING TO JACKSON V. VIRGINIA

The Law as pertaining to *Jackson v. Virginia* 443 U.S. 307 99 S.Ct. 2781. 61 L.Ed. 2d 560 (1979). establishes procedural guidelines For testing the sufficiency of evidence in criminal trials. In jury trials the trier of Fact is charged to make credibility determination. Their determination must be made within the bounds of rationality, and not Fantasy, conjecture, or speculation. Furthermore the triers of Facts can choose to believe the testimony of any witness as long as that witness testimony is rational, Logical and supported by the physical evidence.

However, when the jury is presented with irrational, incredible or otherwise illogical testimonial evidence, if there arises an internal contradiction or irreconcilable conflict with the phyical evidence the jury is duty bound to reject the testimonial evidence and discharge the defendant.

Thus it Follows that irrational, incredible and/or illogical testimonial evidence cannot be supported by evidence tending to show guilt, nor be justified by Law.

Applying the Jackson standard For sufficiency of evidence in a criminal case Louisiana appellate court elects to provide only a minimal Level of review. In cases where the conviction is based on circumstantial evidence La. R.S. 15:438. See *Stamp v. Camp* 446 So. 2d 107. 1209 (La. 1984); *State v. Casey* 775 So. 2d 1022 (La. 2000). each case must be reviewed with careful scrutiny.

16.

In cases where credibility determinations are concerned appellate courts may impinge a jury's credibility findings to the extent necessary to guarantee the fundamental due process of law. State v. Mussal 523 So. 2d 1305. 1310 (La. 1988).

## Synopsis

Even though it was shown at trial that the physical evidence failed to support Officer David Ross irrational and incredible trial testimony, the jury still chose to believe he was shot on the forehead with a dart.

What is astonishing though is that when Guillory's trial attorney filed a motion for post verdict judgment of acquittal Judge Wilson Ramshur[3] deliberately chosed not to make any evidence determination.

Moreover, once Guillory filed direct appeal the First Circuit judge's decided to only review the consistency in the officer's testimony. And it is solely upon this determination the judge's felt rendered the evidence sufficient. No where in their decision did the judge's mention anything about whether the dart Ross alleged shot him supported his testimony. By the courts just agreeing to give "credibility" to the officer's and ignore the physical evidence, it has cost Guillory eight years trying

---

3.  Judge Ramshur is now deceased

to get the courts to admit whether the physical evidence supports Ross' testimony or not, or Guillory's testimony that he shot the wall.

The Facts outlined below will help this Court to make its own determination.

In order to Fully understand the matter beFore the Court Petitioner will detail the Facts and Circumstances of his case to show the State Failed to prove guilt beyond a reasonable doubt.

Petitioner Telly Guillory was brought to court in St. Francisville, Louisiana to Face a charge of aggravated battery; that is a battery committed with a dangerous weapon. In order to prove its case the prosecutor had to show that the battery was the result of an intentional use of Force or violence upon the person of another: or the intentional administration of a poison or other noxious Liquid or substance to another. LSA-R.S. 14:34. and 14:2(3).

Trial started with ofFicer Gerald Scott alleging he seen a dart Fly From petitioner's cell and strike Ross on the Forehead. Tr. p. 28

Asked by the prosecutor Mr. Richard Howell what he Found on the scene ofFicer Scott replied: "What i Found was, well i actually saw the uh dart hit Captain Ross in the Forehead area. AFter it was over with, aFter the confrontation was over with i searched his cell and Found two more darts."

MR. HOWELL. Q. Where did you Find these objects?

MR. SCOTT. A. Uh, the two darts were on his, on his bed. The dart that hit Captain Ross was on the tier.

18.

Q I see. You actually saw this person Fire
the blow, the blowgun at Captain Ross?

A. I didn't actually see the person because
the way the cell is. I saw the dart come
out of the cell door and hit the Captain.

Tr. p. 33.

Thomas too confirmed this on direct examination by the
prosecutor when he was asked:

Q. All right. You were in a position that you
could see inmate Guillory?

A. No. sir, i couldn't see inmate Guillory, i
could see everything coming out of the cell.

Tr. p. 35.

What Scott and Thomas meant to show the jury was that
they seen a dart fly out the first door connected to the booth
itself and hit Ross while he was standing on the tier. Had they
would have placed Ross on the tier at the time they allegedly
s-e-e-n a dart hit him, the physical evidence would have
supported them.

The only person who acknowledged seeing Guillory in
the cell was David Ross when he testified on direct examination
by the prosecutor:

_____

4. Ross Unusual Occurrence Report mimics his
testimony that he jumped out the booth. See Exhibit (A).

19.

Asked to describe what occurred that day Scott testified:

A. Okay. Uh, inmate Guillory was racking down his cell, uh hammering - -.

Q. Can you tell us what that means, racking down your cell?

A. He was either hammering on his, on his bed, on his steel frame, or on the plate. I could'nt see exactly what he was hitting, but he was causing a disturbance on the tier.

Q. You know that it was Telly Guillory.

A. Yes, sir.

Q. How do you know that?

A. Uh, well, he was in the first cell, cell #2, and it's uh quite obvious where the noise was coming from.

Tr. p. 29.

From this line of questioning it can be interpreted that Scott could not see Guillory in the cell, but only knew he was in it because of the noise coming from within it. However, asked later was he at the cell with Ross, Scott replied "Yes, sir, i was." *Id.* Although he never described where he was standing at, his failure to say so turned fatal later on.

At first the jury was led to believe Guillory fired one dart, but asked further how many darts were fired Scott answered "One initially was shot, the one that hit him. When he shut the door we heard other, other uh darts hit the door." Tr. p. 30.

Next to take the stand was officer Willie Thomas who was asked on direct examination by the prosecutor to tell the jury what he witnessed, he testified:

20.

A.    Well, uh Captain Ross and myself were called to the unit due to having a security problem with another inmate. We come to the unit together and we were in the process of handling the situation with the other inmate when Mr. Guillory started beating down, racking, cursing and pretty much calling for us to come to his cell, because by being in Camp-J for so long he knew the next step was for us to quell the disturbance he was causing. And uh Captain Ross went to the cell and ordered him to stop and he didn't and he used a few other choice words, so Captain Ross left the tier.

Q.    What words did he use?

A.    Uh, stuff like " You bitches don't like to mess with me, your scared of me", and all this kind of stuff uh due to his prior history of throwing stuff at officers like human waste and stuff like that. I think maybe less than two weeks prior to this incident he threw human waste on the captain on the other shift. Uh, and uh Captain Ross left the tier and returned with a can of mace and ordered Guillory to stop and he continued.

Q.    What was he doing after he asked him to stop?

A.    Beating down and continually cursing.

Q.    All right.

A.    Uh, Captain Ross come back and ordered him to stop and he didn't, and the next step was whenever he used the mace. And as he was using the mace inmate Guillory shot him in the face with a

21.

dart. Captain Ross jumped back and attempted to close the door, because the cell he's in is an isolation cell that has a steel door outside of the bar, and as Captain Ross attempted to slam the door to keep anything else from coming out, another dart hit the door as it was slamming. So, he reloaded and shot another one.

Q.    All right. You were in a position that you could see inmate Guillory?

A.    No sir, i couldn't see inmate Guillory, i could see everything coming out of the cell.

Tr. pp. 34-35

Officer Thomas' testimony provided the First Lengthly description of what he alleged occurred, but in his haste and benign effort to cast such a disgusting light upon Guillory to inflame the jury, he failed to mention a critical piece of evidence i.e. where he actually seen Ross standing at the time he allegedly seen a dart hit him. A fact much needed for the State which will prove fatal later on too.

Nevertheless, on cross-examination by Mr. Perkins, (defense counsel) of Thomas, it was asked how far away was he standing when he seen the dart came out the cell, he said "Approximately Five Feet." Tr. p. 36.

Then surprisingly he later described to the jury the structure of the cell, another crucial issue in the case.

22.

Q. And you closed the large door?

A. No, sir. Captain Ross did.

Q. You saw him close that then?

A. I was standing a couple of feet from him.

Q. And that's a solid door, is that right?

A. It's a solid steel door.

Q. The door, the door that goes into the cell has just got bars on it, is that right?

A. Right. Well, with these particular cells, they were once used as isolation cells. Okay. They would have bars outside of the cell itself and then there's another enclosure that has a steel door where you can totally isolate him from everything. But those doors are rarely used any more.

Q. That was the one that was used to close at this time?

A. That was the one he closed to keep from being shot.

Tr. p. 38

Although the prosecutor oddly chosen not to take any pictures for the jury to see the cell or the tier area, the jury had enough information to determine the cell has two doors; one connected to the front section of the cell and another to the cell itself which confines Guillory.

23.

Last of the States witness to testify was David Ross, and in his testimony alone it will be shown that there was no possible way under the laws of nature that Scott and Thomas could have seen a dart strike Ross on the forehead. Asked by prosecutor Howell on direct examination to explain his version of events Ross testified:

A. On that date i was called to Car unit at Comp-J, a disciplinary camp, inmate Telly Guillory, i mean uh inmate, there was another inmate having a problem there. All right. In the process of handling that problem with the other inmate, inmate Telly Guillory was racking down causing a disturbance, beating and stuff. I went to his cell, i told him to cease the disturbance. He continued to cause a disturbance and everything.

Q. Can you tell us what he was doing with the disturbance.

A. He was beating, he was taking something and he was beating the sink, its a metal sink. petition, you know, sink and everything, and stomping on his bed, racking the bars, shaking the bars and everything. And i told him well anyway, i told him to cease the disturbance and everything. I left the tier and got a can of mace. Freeze II. I went back to the cell and give him more orders to cease the

24.

disturbance. He still didn't cease the disturb- ance so i was forced to spray a second burst of Freeze II, or mace into his cell to get him to hold the noise down. At that time i sprayed the mace he shot me with a dart right here. And i then jumped back out of the boot, its a boot. its a cell, its got a door in front of the cell that you can shut and confines the cell, restricts the cell. So, i then jumped back out of the booth shut the door and another dart hit the, i heard another dart hit the door then. So, i then come out on the tier...

Tr. p 38

    The State's case was already weak from the very beginning. During Ross' lengthty testimony the prosecutor never even realized the fatal error in Ross' version when he twice said "i then jumped back out of the boot" (its suppose to be spelled 'booth'). This fatal statement by itself was the needle that broke the camels back. And the prosecutor was dutifully required to impeach Ross... he didn't. Consequently, this statement meant Ross was standing inside the structure situated in front of the cell. The area outside of the booth is the tier where Scott said he found the dart.[1]

    Never once did Scott or Thomas testify that they were inside the booth with Ross, or where exactly Ross was standing when they allegedly s-e-e-n a dart hit him. So it can only be concluded that Scott and Thomas was on the tier while Ross was- in the booth.

    This line of reasoning is confirmed by Scott when Mr. Perkins asked him on cross-examination.

Q. You saw him in the cell?

A. Yes, sir.

Q All right. And that's the same person that was removed from the cell?

A. Yes, sir.

Tr. p. 38.

The only reason Ross was the only person to see Guillory was because he was the only one to walk through the booth door. But that's not all, the prosecutor still never paid attention to Ross' testimony even though Scott said earlier he found the dart he seen hit Ross on the tier. Yet on direct examination Ross claimed he found the dart:

Q. All right, Did you get a look at the darts?

A. Yes.

Q. That day?

A. Yes sir. Well, the dart i was shot with i retrieved it. And after inmate Guillory was in the shower i sent Sergeant Gerald Scott back into the cell to shake it down. And the other two darts and the blowgun was retrieved out his mattress.

Tr. p. 39

Since Ross claimed he was inside the booth at the time he alleged he was shot, it is only logical to ~~conclude~~ assume that he found the dart in the booth. However, two darts and a blowgun were

26.

reported Found in Guillory's cell underneath his mattress, according to both Scott and Ross. And, only one dart was alleged to have been Fired that struck Ross. Yet these two officer's are claiming they Found the same dart, but in different area's. Never once did the prosecutor or defense counsel question these officer's conflicting statements. So under the circumstances the jury was totally unable to even determine who was telling the truth.

Next we turn to the most outstanding aspect of this case. All three officer's made it appear to the jury that Guillory shot Ross in the Face with a dart immediately after Ross sprayed him. Any rational minded person would have instantly questioned the possibility and plausibility of these seemingly absurd allegations. Keep in mind though, that to accomplish pointing a weapon at a persons Face, timing and speed is required. And thats not all, all human beings respect pain. It is presumed by law that no sane human being will willfully nor voluntarily stand in the way of apparent danger, unless that person is either (1) Insane, (2) Blind, or (3) unable to see because of some physical object obstructing their view.

Once Ross entered the booth with his can of mace to spray Guillory, he never said he seen a blowgun in Guillory's hand, nor did he say he was blind, insane, or unable to see through the cell bars; cause that's the only object standing between them. By the prosecutor Failing to present sufficient evidence For the jury to infer that Ross was shot because of these reasons; there was no way they could have believed Ross stood in that booth and ignored Guillory bringing the weapon From behind his back. To say he

---

2.   There was no report written verifying Ross retrieved a dart.

27.

Let Guillory, whom he just maced, point a loaded weapon at his face and never once attempted to avoid physical danger, is absolutely absurd.

Remember, Ross said he came to Guillory's cell with mace to quell a disturbance, not because he seen him with a blowgun. Quite naturally by being a correctional officer had he would have seen Guillory standing in the cell exposing a blowgun to him, he would have ordered him to hand it over. So obviously Guillory had it hid from view, just as he testified to:

In the most longest and drawned out version Guillory testified that he was standing by his cell bars facing Ross when he came to the cell. Once there, Ross stated "Didn't i tell you quite making that noise" Tr. pp. 42-43. At which time Guillory admitted making noise, and that Ross was mad at him for protesting what they were doing to the other inmate in the lobby. Guillory knew Ross was going to mace him because Ross was armed with mace the very first momment he came to the cell. However he admitted to only cursing and hollering at the officer's and not jumping on his bed, racking the bars or beating on the sink, but that other inmates were causing a disturbance just as well. Tr. p. 44. He further testified that someone at the tier gate opened it and let Ross and Thomas on the tier. When Ross entered the booth, it was Thomas, not Scott who stood outside the booth next to the door entrance. Also, according to Guillory Ross never gave him several direct verbal orders to cease a disturbance, yet only told him once "Didn't i tell you go back with the noise" Tr. p. 44. At that time Ross quickly maced Guillory.

28.

Then defense counsel asked him:

Q.  What did you do in return?

A.  Huh?

Q.  What did you do after that?

A.  When he sprayed me with mace i came from
behind my back with the dartgun and
when Ross seen the dart gun he jumped out
the boot. When he jumped out the boot i shot at
him. When i shot at him he ducked himself.
And when he ducked himself the dart hit the
wall. It never hit him in the forehead. And
I'm looking dead at him when he did it.
He said earlier that he heard other things
hitting the wall, it wasn't the darts that
was coming out the dart gun, it was bars
of soap. I had bars of soap and a tube
of toothpaste lined up at my bars. So, when
Ross came to spray me with the mace, i had
the darts on my bed, under the mattress, like
and on my bed. When i shot that one, i wasn't
gonna reach back down and get the other one
because he had sprayed me in the face with that
mace, and that mace closed my eyes up. So, when
i laid up there and shot the dart, i had the bars
of soap right there on side the wall, i had took
the bars of soap and started throwing at them,
that's what they heard hit the wall.

Tr. p. 45

29.

As clearly seen From Guillory's testimony, the jury had all it needed to disbelieve Ross' bizarre testimony where he appears to just allowed himself to get shot in the Face. Guillory did not shoot a dart while Ross was inside the booth, but only after he jumped out of it. In order to come From behind his back with the blowgun, put it to his mouth, stick it through the cell bars, get a perfect aim on Ross and then shoot him bullseye, right between the eyes where he pointed to For the jury, necessarily required speed, the advantage of surprise, or just plain insanity on the part of David Ross. The D.A., didn't prove he was insane, nor caught by surprise either.

Had Ross would have testified he jumped back out of the booth, then afterwards was shot in the Face, the jury could have believed him. Had he would have said this he would have provided a reasonable basis For the jury to infer his <u>initial reaction</u> to seeing Guillory brandish the blowgun. An inference that would have also provided a logical explanation of how the dart ended up being found outside the booth on the tier. Neither Thomas or Scott ever said they seen Ross enter the booth, nor even jumped out of it. Therefore the jury was left with the incredible, contradictory and totally unsubstantiated testimony of David Ross that Failed to support the physical evidence. See <u>State v. Mussal</u>, 514 So. 2d 505 (4th Cir. 1987).

The record clearly shows Officer Scott was not speaking of Finding a dart inside the booth where Ross placed himself, because when asked on cross-examination by Mr. Perkins did he Find a dart that hit the steel door once it was completely closed, he testified:

Q.   It sounds like you should have Four then. One hit the one. the one that hit the door, did you Find it on the Floor there when you went to investigate?

30.

A.   No. I'm assuming he. I'm assuming he got it
     back.

Tr. p. 33.


It is hard to tell who Scott was referring to, but without
a doubt, he did not find any dart at all inside the booth area period.
Furthermore, his disciplinary report confirms he found (3) three darts,[4] See Exhibit (B)
therefore Ross' self-serving testimony that he retrieved the dart that
struck him is evidently false. Common sense and the facts dictate, that
the dart Scott found on the tier is the dart Guillory shot at the wall.

    This Court has the record before it, and ample reasons
to declare the prosecutor failed to prove the essential element of
aggravated battery, i.e. physical contact upon the person David Ross
with a dangerous weapon. With this in mind this Court should reverse,
and discharge petitioner as required by Jackson v Virginia, and
In re Winship. Naturally, once the dart hit the wall it would fall on
the tier floor. That proved Guillory was/is innocent.


---

4. See Report Exhibit (B).


31.

# DECLARATORY RELIEF

The defendants in this suit while working under color of state and Federal Law violated Guillory's constitutional rights when they conspired and discriminated to violate the constitution, Laws and treaties of this country.

The defendants in this suit while working under color of state and Federal Law intentionally violated the constitution by refusing to correct an error they knew would have inflicted severe pain and hardship on plaintiff.

The defendants in this suit while working under color of state and Federal Law violated Guillory's Fifth Amendment right when they refused to afford him the equal protection of the Law.

The defendants in this suit while working under color of state and Federal Law violated Guillory's Eight Amendment right when they subjected him to cruel and unusual punishment and thus left him to suffer continuously for the rest of his Life for a crime they know was never proven to have occurred.

The defendants in this suit while working under color of state and Federal Law violated Guillory's Ninth Amendment right when they intentionally and persistently denied him the fair administration of the law as guaranteed to all citizens of this country.

32.

The defendants in this action while working under color of state and Federal Law violated Guillory's Thirteenth Amendment right when they subjected him to slavery and involuntary servitude by deliberately allowing him to suffer the punishment of a unconstitutional Life sentence on a criminal charge for which the State of Louisiana failed to prove guilt beyond a reasonable doubt.

The defendants in this case while acting under color of state and Federal Law violated Guillory's Fourteenth Amendment right when they denied him the due process and equal protection of the Law by refusing to correct a miscarriage of justice.

The defendant George Bush as president of the United State of America is responsible for the acts and inactions of the judges in the herein named Federal courts through the Laws and treaties of this country confered in U.S. Const. Article II s 2 cl 2.

The defendants Kathleen Blanco, as govenor of the state of Louisiana is responsible for the acts and inactions of the judges in the herein named State Courts through the Laws and treaties of this state.

The defendants in this suit while working under color of state and Federal Law intentionally violated U.S. Constitution Article IV s 2 by conspiring and discriminating against Guillory by refusing to afford him the privieleges and immunities of the law when he was constantly denied Post Conviction and Habeas Corpus relief by not providing him a hearing on the argument his presented and/or by refusing to apply the correct standard of statutory and Federal Law as in all other cases.

The defendant State of Louisiana is responsible for the acts and inactions of state actors and employees

The defendants in this suit while acting under color of state and Federal Law intentionally violated U.S. Const. Article III s.1 when they performed their judicial duties in bad faith and caused a prisoner to suffer illegal punishment

## INJUNCTIVE RELIEF

Plaintiff prays that this Honorable Court will order the defendants to declare that his conviction is invalid and his sentence illegal.

Plaintiff prays that this Honorable Court will order the defendants to admit that they allowed an injustice to occur to deprive Guillory of his Liberty.

Plaintiff prays that this Honorable Court will order the defendants to review or reconsider and apply the proper evidentiary standard of *Jackson v. Virginia* to his case.

Plaintiff prays this court will provide the necessary relief it deems adequate in this case.

Respectfully submitted

Telly Guillory #320441

Telly Guillory #320441
Camp-C Saguar 1-R-10
Louisiana State Prison
Angola, La. 70712

34.

# INVIDIOUS DISCRIMINATORY ANIMUS

Plaintiff contends the defendants First Circuit Court of Appeals justices in their ruling on his direct appeal discriminated against him out of hostility and because of their obvious sympathy for Correctional Officers.

On Appeal plaintiff's lawyer argued that the sentence of Life imprisonment was too excessive for the minor injury David Ross alleged he sustained as a result of Guillory shooting him with a dart.

After prejudicing their review of the sufficiency of evidence claim. the justices gave their personal opinion in a non-judicial manner as to why they felt the sentence was justified.

The justices alleged: "After reviewing the instant record, and particularly considering the defendant's entire criminal record, we find no abuse of discretion in the sentence imposed. As noted above the defendant has neither introduced evidence, nor made sufficient argument to establish that he is exceptional or that the instant sentence of Life imprisonment is excessive."

Then in the same breath the Court went further to state "An aggravated and continual history of anti-social behavior merits removal from society for Life. Society has the right to protect itself, and need not absorb repeated assaultive behavior Any person who disturbs the peace of society's members without any effort to correct that behavior is a person who chooses not to belong. So be it." Appeal page (6)

After reading this statement it becomes apparent that the justices created an attitude about plaintiff about this strong case of an inmate shooting a dart at a correctional officer. Although the justices knew plaintiff never hit the officer the mere fact that he was charge with the crime and found guilty was good enough for the justices to agree that it was Guillory "choice" to belong in prison for the rest of his life.

However, the justices knew that Guillory did not choose to be falsely accused, nor illegally prosecuted, or to be found guilty solely upon the lie one officer made that was bogusly supported two other officers.

Further stressing their hostility the justices went further to state:"For constitutional comfort, violence should be a key element in each of the acts which serve as a predicate to an imposition of a life term. Here, we have invasive actions of burglary second degree battery, attempted simple burglary and aggravated battery. The defendant made a choice not "to belong.""

These words by the justices clearly demonstrates their personal and not judicial animosity especially when they said "So be it".

After being denied, Guillory filed certiorari, and was denied he went on post conviction and again was denied. Then he filed a

application for writ of habeas corpus in the Middle District Court. When he gets there magistrate judge Stephen C. Riedlinger gets the case alloted to him.

On June 5, 2003 judge Riedlinger issued his report and recommendation. In it he summarized the testimony's of each officer who took the stand, but when he got to Ross' testimony he clearly had left out the most crucial part of his testimony that Guillory has persistently argued shows Ross was in the booth when he alleged he "jumped back out of the booth" and that the physical evidence was way somewhere else instead of the place where Ross was allegedly standing.

From reading his report Guillory decided that either the judge intentionally skipped over that part or the transcript had been altered. So soon after he filed a Subpoena Duces Tecum for the transcript. In his ruling on the Subpoena judge Riedlinger admitted in a footnote that the transcript does show Ross said he "jumped back out of the booth", but the judge declared that it was "immaterial" whether Ross jumped back or jumped away from the booth, because two officers confirmed seeing the dart hit Ross.

---

Prior to his habeas writ judge Riedlinger had denied plaintiff's lawsuit against David Ross. and other correctional officer's for excessive force and assaulting Guillory after the alleged dart confrontation. See Guillory v. Ross et al, OO-888-DI

So, there judge Riedlinger just totally disregarded what the record truly showed and what Guillory has always argued. Like all other justices in every court he has went to every extent to play games with this case.

All what these justices have been doing is ignoring the facts of the case that the physical evidence contradicts Ross testimony and that his collegues testimony doesn't even support his because the record shows they couldn't see Ross at all inside the booth. But the justice are consistently sanctioning each others bogus rulings that the two officer's Gerald Scott, and Willie R. Thomas, testimony is what supports Ross. In other words these justices are saying that these officer's word alone is good enough to support the verdict of guilt, despite the physical evidence showing otherwise. (i.e. innocence).

Since this present suit has been pending Plaintiff filed a § 1983 civil rights lawsuit against several correctional officer's in Camp-C at Angola. He alleged that a captain told him that they (security at Camp-J) would find him hanging in the cell. See Exhibit (A).

By Guillory having 3 strikes against him for filing allegedly frivolous lawsuits judge Riedlinger again for the third time gets Guillory's case allotted to him. According the magistrate he alleged in his ruling that "Plaintiff's argument is unpersuasive. It appears from the allegations in the plaintiff's complaint that the plaintiff himself triggered the events which form the basis of

the basis of his complaint by possessing a cigarrette lighter
in his cell when he was not authorized to have it. It seems
apparent that the plaintiff can avoid being harmed or injured
by prison guards simply by conforming his conduct to the
prison's rules and policies, and promptly following their orders
and instructions...."

These words coming from the judge shows his egilitarian
approach to plaintiff's complaint. Plus he has persistently denied
everything Guillory has brought to the court relative to his
conviction as though he intentionally has them allotted to him

The judge has displayed his hostility towards Guillory
repeatedly any time his case comes before the court out of favor
tism for correctional officer's. The magistrate never reads Guillory's
suits and give an opinion as to what he alleges but insteads
either points the finger at Guillory for what he deems as misbehavior
on his part that justifies security using force on him and threatening
to kill him. Even though Guillory's suit does not even imply that
he "triggered" anything that security chooses to do on their on.
Or Riedlinger will disregard everything Guillory alleges and favor
correctional officer's despite knowing he's wrong.

The present suit alleges conspiracy on the part of
the justices in the Middle District Court. Stephen C. Riedlinger
and judge John V. Parker are parties to this suit. Therefore
Riedlinger is suppose to have recused himself on the suit he
ordered dismissed without prejudice.

39

Therefore, plaintiff has no other recourse but to file his other suit that subject to dismissal in this Court. because apparently Riedlinger has preconditioned his mind to rule against Guillory regardless of whether or not security do decide to kill him.

In reality Guillory does hope security comes to his cell and hang him, that'll just give his parents a damn good wrongful death lawsuit.

Plaintiff is not afraid to admit that he knows why these justices have discriminated against him, not because he committed a crime, but because they feel that he should not have been shooting a dart at Correctional officer's but instead he should be a good slave and behave like other prisoner's. Their phony approach is easily well hidden, they would not admit they feel this way for the sake of not a trying to getting personal with this case, but their approach implies how they will go the extent of haboring animosity against me for a crime that was never committed nor was proven to have been committed.

Respectfully submitted,

Telly Guillory #320441

RELIEF

State briefly exactly what you want the court to do for you. MAKE NO LEGAL ARGUMENTS. CITE NO CASES OR STATUTES.

Plaintiff prays for Declaratory and Injunctive Relief specified above. Plaintiff further prays that this court award him punitive damages in the amount of $25,000,000.00 (dollars) for past and present and future injury as a result of their acts and inactions.

Signed this ____14th____ day of ____April____ 2007.

_____ #320441
(Signature of Plaintiff)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on: _____ #320441
Signature of Movant

41

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

Telly Guillory
      Plaintiff

Docket No: 07-278-JJB-SCR

   v.

Lieutenant Hebert
Lieutenant Wells
Captain Thomas
Colonel Darren Boredlon
Colonel Charles Honeycutt
         Defendants

## CIVIL RIGHTS COMPLAINT

### JURISDICTION

This Honorable Court has original jurisdiction to hear this complaint pursuant to 42 USCA § 1983. Also this court has jurisdiction to issue and decide a Temporary Restraining Order (TRO) pursuant to 28 USCA §§ 2201-2202.

Supplemental jurisdiction is asked to be attached to this suit pursuant to 42 U.S.C.A § 1367.

*Exhibit (A).*

## STATEMENT OF THE CASE

1    Plaintiff Telly Guillory is before the court presenting a string of incidents that's been cleverly disguised to not cause any alarm, but has every indication as a threat to his life and his freedom.

2.    Everything exposed in this suit that has occurred recently stems from plaintiff's conviction in September 1998 whereby he was charged aggravated battery on a correctional officer named David Wayne Ross.

3.    According to this officer it was alleged that plaintiff shot a homemade dart at him and it struck him on the center of his forehead. The officer lied, and falsified his report. Plus he never initially reported the incident to Warden Burl Cain. No investigators or investigation was ever summoned to the scene of the incident to look for evidence to verify what the officer accused plaintiff of.

4.    Approximately two months after the incident occurred Warden Burl Cain took it upon himself to have plaintiff booked in St. Francisville jail all the while he knew the incident was never reported, investigated, and obviously could not have happened under the described circumstances.

5.    Fortunately, but unfortunately the warden made a great big mistake. His arrogancy, led him to believe he was handing over a bad culprit to the courts who deserved to be punished for retaliating against one of his officer's. So, on September 22, 1998

6. So on February 4, 1999 plaintiff was sentenced to life in prison as an habitual offender.

## STATEMENT OF THE CASE

Plaintiff Telly Guillory is a prisoner at Louisiana State Penitentiary at Angola, La. who is beheld in prison against his Will by the State of Louisiana and the United States government. Plaintiff is presently serving a Life sentence for aggravated battery against a correctional officer by the name of David Dewayne Ross. (Ross is no longer employed with the Department of Corrections.)

Since his conviction in September of 1998 plaintiff has feared for his Life in Angola because his charge stemmed from the false allegations of a former correctional officer (C.O.). However, he has not had any type of problems with other C.O.'s in the institution on account of his charge.

Nor has he had any problems with making the Board and being transferred to working cell block on account of his charge or conviction.

During the course of nine (9) years plaintiff has advanced his argument on habeas and post conviction relief that the evidence is totally insufficient. The prosecutor failed to prove guilty beyond a reasonable doubt because the physical evidence proved plaintiff innocent.

The Louisiana State and Federal judicial system has enjoined themself in a serious conspiracy to deprive plaintiff of the equal protection of they, and thereby violated the constitution by intentionally refusing to correct their own sufficiency of evidence evaluation.

In February of this year 2007 plaintiff and Vincent Simmons submitted a class action suit against the entire judicial system which is presently pending in the District of Colombia.

7.  Two years after his sentence plaintiff obtained his trial trans-cript, and that's when he realized that Ross was not so good at lying. But L' Cain was not so sharp at paying close attention to Ross' False report and the prosecutor won his case because he used perjured testimony.

8.  From reading the transcript plaintiff realized For the First time that the officers testimony and statement conflicted tremendously with the physical evidence. But that the courts have been intentionally and repeatedly misapplying the law to the facts to avoid addressing the issue of whether the physical evidence support the officer's testimony or my testimony.

9.  After 9 years of trying to challenge the insufficiency of the evidence in his case, and finding that the Louisiana judicial system is biased plaintiff and Vincent Simmons filed a class action section 1983 civil rights lawsuit against every court (including this court) and judge who presided over their habeas and post conviction proceedings throughout the time they have been challenging the unconstitutionality of their convictions.

10. The suit was filed in February of this year and is presently pending in the District of Colombia. From that moment on security officer's in Camp-C have been trying to find ways to seperate Simmons and plaintiff from ground each other, but not make it look so obvious. I cannot name their names herein because i do not know them by name, but i know that several officer's have come on the tier pointing at me and Simmons to other officer's usually i would pay them no attention because as long as they don't touch me or threaten me, i want react, to get their names or badge number.

11. Despite my saying this, because of my conviction being one stemming a correctional officer and not a civilian. numerous officer's in this institution know that officer David Ross lied on me, but they also know that i pose no threat to any officer or security in general.

12.    Last year, however, around June or July plaintiff made the Board out of Camp-J extended Lockdown to Camp-C extended Lockdown.

13.    Normally in this institution once a prisoner is transferred from Camp-J to another extended Lockdown Camp, he will have to complete 90 days, with good behavior, to make the board to working cell block.

14.    So far plaintiff has been before four boards, he hasn't had any write-ups, but security continues to deny him the board every time he went before them.

15.    One day plaintiff asked the assistant warden Mack Shaw, and Colonel Bordelon if they were intentionally denying him the board because of his criminal case. They both acknowledged that was not their reason and at that assured me they would let me make the April Board. Yet when the April Board came Colonel Bordelon denied me again.

16.    In all actuality, plaintiff never did, nor does care about making any institutional discipline board by his captors. All he desired to determine was whether these people were out to harm him or make his suffer more punishment out of retaliation because of his case.

17.    It just so happen, that soon thereafter in an unrelated incident that recently occurred a Captain a Camp-C made an implied threat that security would find Guillory hanging in the cell in camp-J.

18.    On April 16, 2007 at approximately 5:30 p.m. Lieutenant Hebert was coming down the tier hall to clock in for work. Upon approaching my cell he noticed a green cigarette Lighter Lying on my desk. Immediately he froze, stunned that he had caught me with a Lighter red handed. I'm Looking at him, and it was as if he had just stumbled upon a bag of heroin. He could not even conjure the words "give me that, or give it to me" as

he attempted to come towards my cell to grab the lighter, off my desk.

19.  Much to his surprise, i immediately on instinct grabbed the lighter and threw in the toilet and flused it. That instantly infuriated him. All the while i can see the hurt on his face especially since I'm laughing at his phony attempt. He automatically believed that just because I'm a prisoner i was suppose to be scared of his badge and authority and just hand him over the contraband. . . I'm not a civilian.

20.  Once he moved on away from my cell to go clock in he says "I'm coming in that fucking cell." I said "I don't give a fuck about you coming in this muthafucking cell man, this is your cell, i just live in it. You have every right in the world to shake it down. You ain't gon find shit." That pissed him off even more. So then he replies starkingly: "I'll call the lieutenant and have him bring that mace and we'll spray your fucking ass down." I then boldly replied: "So what, go call him and matter of fact. tell him to bring the tag team. i don't care". Hebert vehemently shouts: "You want the fucking tag team muthafucka I'll call them to."

21.  So then he closes the door to the clock box and storms off the tier. Once in the lobby i hear him immediately get on the phone and calls some one. I can hardly hear what's being said because I'm in cell-10 way in the back of the tier, but i discern him telling that particular someone to bring a can of mace, and then he gives them my name.

22.  Approximately 15 minutes later Captain Thomas, a booth-lickin-slave-minded-negro and his confederate collegue subordinate Lieutenant Wells come on the tier with tickled-pink Hebert in tow.

23.  Everyone on that tier and probably elsewhere's knows that Wells and Hebert are two racist white boys who cannot stand African American people period. They just put up with them cause they have to. As far as their attitude

towards African American prisoner's goes those two white boys will come on the unit and kick off all kinds of chaos with their childish kitty matenee' just to provoke prisoner's to argue with them and start cussing. A prisoner doesn't have to cuss them out. But just by merely using profane language while in a heated conversation with them. If they feel the prisoner is being bold. vociferious, sarcastic, or cocky, that's cause for a macing. This is how Wells and Hebert operate to agitate and provoke prisoner's in cells.

24.    But on this particular day, here comes someone else to get a piece of the action. Lt. Wells did not want to mace me himself because he already felt i had previously filed an A.R.P. or something a month earlier for him harassing me about having my cell light on at night. So, when Captain Thomas gets to my cell. Hebert and Wells sneaks off towards the back of the tier to clock in.

25.    So now Thomas stands at my cell and asks me whats my problem. I briefly explained to him how Hebert seen the lighter on my desk, and how i picked it up and threw it in the toilet before he could ask me to give it to him. Then Thomas says: "Well, my officer said you cussed him out" at this time he shifted on his feet and turned his left side towards me near the cell bars. while his right side is leading away from the cell so that he can hide what he got concealed in his pocket. So while I'm explaining to him what i did say, once i said "all i told him was he could shake this muthafuckin cell down if he want to." Thomas replied: "Well, that's good enough right there".

26.    At that moment he withdraws out of his pocket a can of mace and sprayed in my right eye. I quickly turned away from the cell bars, one eye opened one eye shut, ran to the sink and grabbed a bottle i had previously filled with soap and water and squirted it at him. I'm hoping to spray it in his eye and let him see how it feels to spray chemicals in people face to have their eyes burning.

27.   These dirty minded coward officer's in Angola believe that just because a negro is in a cage he's suppose to allow them to do him all the harm they want. They have a cold blooded tenacity for spraying mace. Its fun and game to them. And the average one of them will spray it untill the can is nearly empty.

28.   After my unsuccessful attempt at trying to squirt soap in Thomas eye (because i couldn't see him, my eyes were shut) and seeing that he was still spraying me undaunted, i quickly jumped on the top bunk bed, punched the light covering to break the plastic around the screws so that i could retrieve the light bulbs. i only able to save one from breaking, and threw the other towards the adjacent wall in the cell where it shattered. The gesture was as bad attempt to aim at him and scare him, but it did caused him to stop spraying mace him and wells, cause by that time he had joined in with his own can.

29.   After this episode was over. Lt. Hebert. Lt. Wells and Capt. Thomas all left off the tier tickled pink that they had justfiable grounds now to have a bon-fem-roulette.

30.   Once in the lobby one of them calls for the tactical team to do a cell entry. Ten minutes go by, no one shows up. I then opened my locker box and placed my documents and legal material in it, but i couldn't close the lid. Suddenly though. i hear somebody at the head of tier yell "Telly Guillory you coming to the bars to be restrained". I said loudly "yea". Then this same person tells someone else in the lobby "He said he aint coming to the bars." Angry prisoner's on the tier shouted back "that man didn't say that. That man said he's coming to the bars." All the time i knew this was the old routine these people play with us to justify calling the tactical team. It really doesn't matter what our response be. Although. i never refused to be restrained or come out of the cell.

31.   Approximately, 10 minutes later Lt. Wells and Captain Thomas crept down the tier, both had a can of pepper spray in hand, upon approaching

my cell, they both commenced spraying this vividly dark red chemical mace all over my cell and on me. For no reason whatsoever. I didn't even turn around to face them, just kept my back turned standing by the Lavaratory. By this time both my eyes are shut and my right eye was swollen. I had no way to defend myself against these two rogues who were solely abusing their power, excessively macing me on some Frolical adventure of their own.

32.     In the process, by my locker-box lid being open, my legal documents that were lying atop everything got soaked in chemical mace.

33.     After they sprayed this other more powerful chemical mace, they left the tier and stayed in the lobby waiting for the tactical team to arrive. However, when they did show up. Captain Groom, and another Captain over the tactical team came to my cell. The other tactical team members stayed in the Lobby, and thats because Groom knows me very well, he knows i will not cause no any trouble unless provoked.

34.     So then the caucasian Captain asked me if i would come to the bars. I said "yes" and complied. He placed cuffs on me, and leg irons and began escorting me down the tier. Groom on my left and the other Captain on my right. While walking and clearly out of earshot of all the other officer's the caucasian Captain asked in a *soto voce* tone. "who's Fuckin with you." I equally whispered "Hebert." Then he told me straight up " Don't make me have to come back tonight." I shook my head and mumbled "okay", and he continued "I'll talk to them and everything'll be okay."

35.     I was then placed in the shower, took a brief shower, placed back in restraints and brought in the lobby. No one touched me, harrassed me, or nothing. However. Wells, Hebert, and Thomas could not even look me in the eye because they were dissappointed they could not get the satisfaction they wanted with the peaceful change of event.

36.    Subsequently, i was taken outside between the breezeway of Jaguar 1-2, 3-4 units to await a patrol driver to escorte me to Camp-J dungeon. The tactical team members by this time had left the area. As I'm standing in the breeze way Captain Thomas told me in a menacing tone "You think your ass got Lucky this time huh bitch, but i guarantee you i gotcha ass." I said "yea, i hear ya, if you want me that bad, do me now." He replied "Just be cool bad muthafucka and i promise they'll find your black ass hangin in the cells at J."

37.    [At that, i knew this negro was hinting at calling his buddies in Camp-J to attack me the very moment i entered the Camp. There was i recall a previous hanging in Camp-J of a prisoner named Johnathan Stevenson In that incident it was reported that Stevenson beat up an officer by the nick name Cat-daddy in Camp-C. Out of retaliation for this assault, it is rumored that Captain Bonnette, Lieutenant Orr and several other officer's tied something around Stevenson's neck and strangled him to death in cell-3 in Gar unit dungeon. Then they left him hanging from the bars. two minor officer's seen him hanging and never attempted to get him down. According to the Baton Rouge Advocate newspaper it is reported that Warden Burl Cain is trying to cover for his officer's saying that Stevenson hung himself. despite a coroner's report clearly showing the inmate was murdered.]

38.    Plaintiff is well aware that Cain will protect his officer's for the wrongdoings they do, and will condone them beating gassing and murdering prisoner's all to save his reputation as the only warden in history who changed Angola. from a violent to non-violent institution.

39.    Now once the patrol driver Sgt. Morris came and placed me in the van, he asked Lt. Wells "do i take him to the hospital or has he been seen already." Lt. Wells answered "EMT seen him already." When Sgt. Morris sat down in the drivers seat and closed the door. i told him "he's Lying Sergeant i never seen the EMT, nor ever refused to be seen." But he never responded

Mminute's Later we arrived at Camp-J at about 6:50 or 7:00. the First person i see coming down the walkway is Lt. Orr. As he came nearer to us he yells to Morris in a countryFied tone "is this the retarded muthaFucker who threw shit on the Captain." Morris didn't reply. Yet i know by this statement that Captain Thomas had called Orr and told him i threw human waste on him so as to intensify the situation in hopes having Camp-J security physically attack me. Orr whom i never seen nor met before seemed eageredly desperate to latch on to me right then and there. So then he asked me "you shit the Captain down." I replied "no, unless you call water and soap shit." Then he asked me about how Long i been in prison (Fishing me) i told him 15 years. he says "want be all that shit throwing back here in this camp." I knew what he was implying so i quickly responded, "Man Look here. Fuck Camp-J. I've done 11 years in this camp. This my stomping ground back here, everybody knows me in this came." Then i Left as that, but he got the impression he wasn't messing with no scared Little rookie.

41.       So now once we get on Gar unit and enter the Lobby i noticed Colonel Honeycutt standing by 1-Right tier gate (the dungeon) reading a newspaper. I walked over to him and said in a Familiar tone "Honeycutt (instead of CoL. Honeycutt) i need to see the EMT For my hand, i got deep Lacerations to my hand For punching the Light Fixture in my cell." He Look conveyed he recognized me, then he looked at my hand and seen it cut up and bleeding proFusedly. He then Looked at Orr and said "Did he see the EMT" Orr answered "they told me he did." At this time Lt. Wright and another officer came From around the corner where they were waiting in ambush and when Wright see me he yelled in a Familiar voice "Heeey Guillory, what the hell you doin back." I replied "I miss everyone". Then that's when Honeycutt asked Wright did they call you and tell you he had been seen by the EMT" Wright replied "Yea. i just got off the phone with them."

42.       That's how i knew it was a planned ambush, but by seeing my

hand was in bad condition Honeycutt knew i couldn't have been seen by the E.M.T. So he gets on the phone and calls someone. By that time Sgt. Allen, the unit officer placed me in the shower on I-Right tier, and i couldn't hear the conversation.

Minutes later i see Honeycutt get up from the desk chair telling Wright. Orr and Sgt Boyd something about what they on the phone said, but i couldn't make it out. So then they (supervisors only) left. When Sgt. Boyd came by the tier gate i questioned him about what Honey-cutt was saying, all Sgt. Boyd offerred was "he said the tag team didn't do a cell entry, so you didn't need to see the E.M.T." I left it at that and made no further inquiries about the E.M.T. Although I'm aware that posted policy says that it's mandatory that i be seen by medical personal to have my eye's washed out whenever mace is used, regardless if the tactical team made a cell entry or not. Plus with the visible injury to my hand i was suppose to have been treated and given some medicate to prevent infection. I knew it was all a cover up to hide all that mace used on me.

44.    Nonetheless the next day April 17, 2007 i tried to stop the E.M.T, but he just zipped past my cell, as they usually do when they see we have no sick-call sheet in the bars. Unfortunately at the time the unit did not have any sick-call sheets available. However, i did stop the social worker John McNeely and told him about my situation and he documented that security officer had threatened to hang me.

45.    Till date my eye is still red: slightly swollen and burning from the macing, and i can barely open my right eye lid. My hand has beaun to swell and their are several lacerations and cuts all over my right knuckles, I have still not been seen no treated three day after the incident for my injuries, and as a result have been deliberately denied medical attention.

46. On April 18, 2007 i went to Disciplinary Court and major Smith the board chairman read the two reports. One From Hebert and one From Captain Thomas. According to Hebert he said he seen me with a lighter in my cell burning something. and he told me to give it to him, but i refused and cussed him out, then threw the lighter in the toilet. I knew he was lying about every thing, but in Capt. Thomas' report he said he came to my cell and seen me smoking a cigarette and asked me to give him the cigarette, but i refused to do so, and then refused his orders to come to the bars to be restrained and started cussing him too. Both officer's painted a fine picture of me being a hostile, and cantankerous person. At that Thomas alleged he administered a one (1) second burst of mace in my cell, and then said i reached in the toilet and threw human waste on his jacket, and threw a light bulb at him.

47. This man obviously lied and said i hit him with human waste although he could never say what was in that bottle Found in my cell that i had in my hand. It was never confiscated, and put into evidence For testing. So now he can have me charged in St. Francisville simply on what he said, not proof of what was in the bottle.

48. Nevertheless i plead not guilty to both reports and noted to Major Smith that the reports contradict each other. Hebert said i threw the lighter away, but Thomas said i was smoking, and at that smoking when he approached my cell. That's plainly absurd to be that bold, it does fit my character. Smoking in extended lockdown is a violation, being seen by security is asking For trouble. But that's what Thomas used to justify macing me.

49. Now according to what officer Thomas said about he ordered me to come to the bars to be restrained he's lying about that. But i want this court to note this herein because it is the primary issue that surrounds this case. It is customary as well as standard procedure For a supervisor to document that he ordered a prisoner to the bars to be restrained, if the inmate disobey's the order, supervisors can employ a 1-or-2 second burst of mace in the cell to gain compliance according to posted

policy. Most supervisors do not Follow the proccedures outlined in the prison policy but only write in their reports a colorable and indefensable report to make it virtually impossible For a prisoner to sue them.

50    In the event a supervisor is confronted with an inmate who is destroying property, injuring himself or another. supervisors are required to order the inmate to the bars to be restrained, or mace the inmate to prevent further destruction of property or injury to self or others. If the officer's intentions is to restrain the inmate he is to have a set of restraints brought to the cell by another officer. Failure to have those restraints at the cell, can result in disciplinary action against the supervisor.

51.    To show that Capt. Thomas did violate posted policy, he never came to my cell with a set of restraints. In his report (Like in numerous reports written by supervisors) they will always write "I ordered the inmate to come to the bars to be restrained) this statement acts as coverage For actually not have restraints, but it does imply the officer's intent to subdue a prisoner. However, as mentioned earlier Capt. Thomas came to my cell by himself, he kept his right hand in his pant pocket where he had a can of mace. Hebert and Wells were at the time clock the whole time. No one had a set of restraints. So Thomas' intent was to use force automatically with or without provocation.

52.    It is common in the extended Lockdown enviroment For supervisors to use excessive mace on prisoner's For either using profanity during their conversations with security. Whenever another officer accuses the inmate of cussing him. If security deems the language unsuitable, cocky, sarcastic, or bold on the part of the obsteperous prisoner they will use excessive force. Yet they know that no policy protects them For using force of any nature on prisoners For speech they elect to use. So in order to justify doing so they will commonly allege they ordered the inmate to come to the

bars to be restrained.

53      Another common feature that officers in extended lockdown are generally known for is lying about how much mace they employ on prisoner's. It is standard to document a 1 or 2 second burst was used when in fact they do not stop spraying us until they get the desired satisfaction they need or until the can is empty. And usually more than one supervisor at the cell will be spraying the prisoner.

54.     According to officer Thomas' report he said he used a 1 second burst of mace on me, but i have proof with the documents in my locker box to show he used way more mace than reported. I will try to obtain my property and gather the papers that have mace on them and submit it to this court as evidence.

55.     As it stands i have every legitimate reason to take these people serious about thomas threat/promise to find me hanging in the cell. Be it genuine or not, because i am a known political prisoner. and have been very litigious with filing complaints in this court for over 12 years. I now have a life sentence because Warden Cain allowed an officer to issue a false report to convict me of a crime i did not commit, nor was proven at trial i committed. I have a civil suit now pending in Washington D.C. behind this and am requesting $25,000,000. 00 (dollars). Warden Cain knows this, plus he knows my release is inevitable, and he is aware that i can sue him and D.O.C. behind the wrongdoings they did in order to have me convicted. I am placing this court on notice of my situation before anything dangerous happens to me.